**UNITED STATES of America**

v.

**856 CASES, MORE OR LESS, each containing 24 packages of an article LABELED in part "DEMI", etc.**

**Civ. No. 10186.**

United States District Court
N. D. New York.
April 22, 1966.

Justin J. Mahoney, U. S. Atty., Albany, N. Y., for libelant; Frank A. Dziduch, Asst. U. S. Atty., William Pendergast, Atty., Dept. of Justice, Washington, D. C., of counsel.

Breed, Abbott & Morgan, New York City, for claimant, Carter Products, Inc.; Whalen, McNamee, Creble & Nichols, Charles E. Nichols, Albany, N. Y., William L. Hanaway, Stephen R. Lang, New York City, of counsel.

JAMES T. FOLEY, Chief Judge.

In this libel action for condemnation of margarine products, a dispute as sharp and intense as one can be arises in regard to the interpretation of the purpose and intent of certain provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., and the legislative history relevant thereto. This Act has been recognized as a ponderous statute. (United States v. Sullivan, 332 U.S. 689, 705, 68 S.Ct. 331, 92 L.Ed. 297). The complexity of the task is compounded when it is agreed the interpretative effort must range also into particular provisions of the Federal Trade Commission Act and the Internal Revenue Code. (15 U.S.C. § 55; 26 U.S.C. § 2300; see Sutherland Statutory Construction, 3rd Ed., Sections 5201, 5202).

The government libelant and the claimant, Carter Products, Inc., admitted shipper interstate of the cases and packaged products, both move for summary judgment. Essential and material facts in the presentation for summary relief are accepted as undisputed by the parties sufficiently to permit legal ruling at this stage. (Empire Electronics Co. v. United States, 2 Cir., 311 F.2d 175, 179). The claimant concedes, and I agree, that under the issue as posed there is only need to decide on a basis of the statutory language, purpose and history of the legislation without determination of the separate defenses in its answer that the administrative standard for margarine is in excess of statutory authority or its implementation violative of the Fifth Amendment, as an unlawful taking of property.

I have found the road of legislative history and statutory interpretation extremely difficult to follow and reach conclusion with comfortable, reasonable certainty. The position in the briefing, urged with persuasiveness and vigor on both sides, is miles apart in regard to the purpose and intent to be derived from the legislative history and statutory enactments all set forth in the same English language. I am aware of sincere concern on the part of the government that decision adverse to its points may have far-reaching consequences in a market given special attention for years by the Congress seeking control and balance with delicate precision in the national interest. Despite this caution, my sights must be kept within legal principles, and after canvass, recanvass and prolonged deliberation it is my conclusion that straightforward measurement of legislative expression of the Congress in debate, conference and statutory wording favors the claimant. Apparently, the question created by this seizure in this Northern District of New York is the first of its kind in the nation involving these noted products: butter, margarine and imitation margarine.

Briefly, to set forth the background particularly as to agreed facts that clearly allow summary relief as a legal proposition: The 856 cases of Demi were seized in Albany in July, 1964, under the libel alleging that Demi is and purports to be a margarine and does not meet the standards prescribed for margarine by

the Secretary pursuant to law. (21 U.S. C. § 341; 21 CFR 45). To state it in my way, Demi admittedly contains 38% fat instead of the 80% fat that is called for, and also other ingredients not contained in the definite administrative standard for margarine. The Demi packages by prominent lettering in several conspicuous places are labeled: "Imitation Margarine". In this diet-conscious day, the brightly colored label attracts judicial notice now just as it will public attention by the repetition several times on the label: "Demi—Imitation Margarine—half the calories of margarine." The label sets forth not only a detailed listing of ingredients but a calory count chart of comparison with standard margarines.

The libel of the government does not claim Demi is unwholesome or unfit for food, nor that its labeling is improper or the listing of ingredients inaccurate. It is acceptable to the government that Demi be considered similar to margarine in appearance, composition, color, taste and melting qualities and used for the same purposes and manufactured and packaged in the same manner as margarine would be. The government described Demi as a colored margarine—a non-dairy product made in imitation and semblance of butter.

The narrow issue for these motions as framed by the claimant is whether a wholesome and accurately labeled imitation margarine can be marketed as Demi was attempted to be as such an imitation margarine, or whether, as the libel in effect claims, the Federal Food, Drug and Cosmetic Act contains a blanket prohibition against the sale of any product made in semblance or imitation of butter unless it conforms to the standard of identity for margarine. The position of the government, not too different from the above, is this: "Demi violates the Federal Food, Drug and Cosmetic Act because Congress has declared that *all* products made in semblance of butter are to be called 'margarine'; that there shall be but one imitation of butter and it shall be called margarine, and that imitations

of butter which must be called margarine must, in all cases, comply with the standard of identity for margarine. Since this product does not so comply, it violates the law." (The emphasis supplied as made in government brief, pg. 7). The dogmatic assertion laid to Congress that all products made in semblance of butter are to be called margarine and that there shall be but one imitation of butter is striking statement. Such significant expression in express or satisfactory implied form would seem subject to simple search to uncover, but there is nothing evident to me in the legislative history or the several statutes involved to such effect.

The government urges, and there is no doubt, that the Congress for many years has given special concern to the control of margarine products in view of their semblance to butter. The first legislative definitions of margarine and butter came in 1886. Butter was defined as the food product known as butter made from milk or cream, and margarine as all of those substances "made in imitation or semblance of butter." (24 Stat. 209, Sections 1–2). From this beginning and premise the government earnestly says there was a carry-through into the Oleomargarine Amendments of 1950, (P.L. 459, 81st Cong. 64 Stat. 20), with which we are most concerned, of a concept that margarine, being imitation butter solely, then a statutory policy is evident there can be no imitation of margarine itself.

The definition from the 1950 Amendments in the Code does define oleomargarine or margarine to include "[A]ll substances * * * which have a consistence similar to that of butter * * * if made in imitation or semblance of butter." 15 U.S.C. § 55(f) (2). The claimant refers to an address made by Food and Drug Administration (FDA) Director Rayfield, Bureau of Regulatory Compliance, in June 1964, which does express pointedly the departmental policy and reasoning in regard to the exact problem here by the attempt to market

imitation margarine. Director Rayfield said:

"Things equal to the same thing are equal to each other. Thus, if margarine is in imitation or semblance of butter, then imitation margarine is an imitation or semblance of butter. By the law's definition, therefore, the so-called imitation margarine is margarine. Margarine, under the standard of identity, must contain not less than 80% fat. We cannot consequently accept * * * the marketing of an 'Imitation Margarine'' containing less fat than required under the standard of identity."

Many of the statutes created by the Oleomargarine Amendments of 1950 are relevant generally to this problem relating to background definition of a food, prohibited acts in the introduction in commerce of adulterated and misbranded food, the powers of the Secretary of Health, Education and Welfare to promulgate definition and reasonable standards for any food with the avowed purpose to promote honesty and fair dealing in the interest of consumers. (21 U.S.C. §§ 321(a) (f), 331(a), 334(a), 341–342).

However, there are really only three statutes upon which attention here for decision should be focused: First, 21 U.S.C. § 343(c), stating a food shall be deemed misbranded if it is an imitation of another food "unless its label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated." Next, 15 U.S.C. § 55(a) (2), clearly declaring an advertisement to be deemed misleading if the advertisement represents or suggests in any form that margarine is a dairy product followed by the restrictive preface in (f) that the definition of oleomargarine or margarine is "[f]or the purposes of this section and section 347 of Title 21," etc. The third, the definition of oleomargarine defined in 26 U.S.C. § 2300 (I.R.C.) and regarded and characterized in the Conference Report of the Congress in March 1950 after elaborate hearings, discussions and debate by the conferees of the two Houses

"as obsolete". (Conference Report 1731, 81st Cong. 2nd Sess. pg. 7, U.S. Code Congressional Service 1950, p. 1968).

■ From this Conference Report came the definition in 15 U.S.C. § 55 (f) relied upon so strongly by the government. However, I agree with the argument of claimant that the important prefacing words of the definition in no respect exempt or limit oleo or margarine from the imitation right of sale, if properly labeled, of every food if its ingredients and properties do not comply exactly with the administrative standard. (21 U.S.C. § 343(c), (g). The government insists margarine is the one food product of all foods that must be eliminated from the imitation privilege of sale accorded, even though the other statutory requirements for imitation labeling are met. I would think in my amateurish way that the Congress, by addition of a few words in several of the particular sections, could have clarified easily for all this singular, isloated status for margarine that would prevent its sale in imitation form.

Both sides to this motion, oddly arguing from the same wording that it favors them, place such emphasis upon a substantial statement in the Conference Report on the 1950 Oleomargarine Amendments, Conference Report 1731, pg. 7, that I shall set it forth in full:

Senate amendment No. 12 prior to its amendment by the conference committee also contained a definition of oleomargarine similar to the one contained in the Oleomargarine Tax Act (26 U.S.C. 2300). That definition, however, was regarded by the conferees as obsolete. As rewritten and agreed to by the committee of conference, the definition includes within its terms not only those substances known as oleomargarine and margarine, but also "all substances, mixtures, and compounds which have a consistence similar to that of butter and which contain any edible oils or fats other than milk fat if made in imitation or semblance of butter." This definition is not intended to nullify or impair the definition and standard

of identity for oleomargarine which has been adopted under the Federal Food, Drug and Cosmetic Act. That definition and standard of identity promulgated to promote honesty and fair dealing in the interest of consumers, provides assurance that articles which are represented as, or which purport to be oleomargarine, shall measure up to at least minimum standards for fat, shall be prepared in a specified way, shall contain only those optional ingredients which are expressly permitted, and shall bear the labeling statements prescribed for such optional ingredients. Under that standard an article which is represented as or which purports to be oleomargarine but which for example contains less than 80 percent of fat, would be misbranded within the meaning of the Federal Food, Drug and Cosmetic Act. Such a product, however, would be oleomargarine for the purposes of new regulations provided in this bill, although it would be misbranded oleomargarine under section 403(g) of the present law. The statutory definition in this bill was deemed desirable in order to emphasize the purposes of the Congress that the oleomargarine-like or butter-like products which fail to meet minimum standards should in every case come within the controls here being prescribed as well as within the controls of other applicable provisions of the Federal Food, Drug, and Cosmetic Act. U. S. Code Congressional Service 1950, p. 1981.

■ I am unable to glean from the wording in this legislative history, as the government is, a legislative intent that there is only one imitation of butter and that is margarine, for which reason margarine cannot be sold as an imitation margarine. The statement from the Report as I read it is in accord with express statutory law that margarine would be misbranded if sold as such and did not meet the standards required. (21 U.S.C. § 343(g)). But that is not this situation because the imitation margarine here only purports to be that and not marga-

rine. I do agree with the claimant that the concluding sentence of the conference statement places oleomargarine or butter-like products primarily under advertising controls. The words "as well as within the controls of other applicable provisions of the Federal Food, Drug and Cosmetic Act" does not eliminate margarine, in my opinion, from the right of the express provision in 343(c) that a food is not misbranded if labeled as imitation.

■ Further, it seems clear in settled case law and in other statutory references that margarine is capable of and given its own separate identity. In upholding the government in 1942, Land O'Lakes Creameries, Inc. v. McNutt, et al., 8 Cir., 132 F.2d 653, 658–659, agreed expressly that oleomargarine is a well-known food product with an identity of its own. The government here tries to disown or at least discount this holding, arguing the 1950 Amendments made a statutory change overruling this description, but I am unpersuaded. Further, Sections 342 and 25 of Title 21, in my opinion, by the wording separates margarine from butter and the other butter-like products. Nowhere do I find margarine is to be considered solely as the one product that is imitation butter.

■ The legislative history again, and other case law, shows that the paramount reasons for the 1950 Oleomargarine Amendments were to use every possible precaution legislatively to protect the consumer from having passed off on him margarine for butter. Senator McCarthy stated the purpose was to prevent any form of advertisement which gives the impression directly or indirectly that the consumer is buying butter. (96 Cong. Rec. 128–9, 1950). Senator Wiley, also from a dairy and farming State said: "The whole purpose of the Amendment is clearly to indicate that it would be illegal for the oleo interests to advertise their products as dairy products. This is the sum and substance of the Amendments." (98 Cong.Rec. 129 (1950)). In our own Circuit E. F. Drew & Co. v. Federal Trade Commission, 2 Cir., 235 F.2d

735, 738–739, declares 15 U.S.C. § 55(a) (2) as designed legislatively by its wording to prevent representation of oleomargarine as a dairy product. In United States v. Rutstein, (SDNY), 163 F.Supp. 71, 78, District Judge Bryan, after setting forth an exemplary and comprehensive collation of legislative history to be found concerning the Oleomargarine Act of 1950, remarked that the battleground upon which the extended oleomargarine fight in Congress was waged was not upon tax repeal at all, but rather as to the best methods of protecting consumers from the danger that oleomargarine, because of its similarity to butter, might be misrepresented as butter to the unwary consumer.

█ In consideration of the above, it seems to me that imitation margarine is farther removed from the area of possible misrepresentation than margarine would be. The fear of deception I would think is doubly guarded against when sold as imitation margarine, and the only one who might complain, fortunately not as yet, is the plain margarine seller. An extremely important case, in my judgment practically decisive here, is 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, ending at pages 600–601, 71 S.Ct. 515–520, 95 L.Ed. 566, with judicial declaration that is indistinguishable—in view of the treatment of margarine as a food—from what we are looking for:

"If Congress wishes to say that nothing shall be marketed in likeness to a food as defined by the Administrator, though it is accurately labeled, entirely wholesome, and perhaps more within the reach of the meager purse, our decisions indicate that Congress may well do so. But Congress has not said so. * * *"

My review of the legislative history and terminology of the statutes does not lead me to the strong inferences and conclusions argued for by the government. (Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 449, 75 S.Ct. 488, 99 L.Ed. 510; CIR v. Bilder, 3 Cir., 289 F.2d 291, 297, et seq.). Nor from this review do I feel decision for the claimant leads to unreasonable result plainly at variance with the policy of the legislation as a whole. (Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199; Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 484, 489, 71 S.Ct. 456, 95 L.Ed. 456). With the clear right, I find there can be no legal compulsion placed upon the claimant to petition administratively for a new standard for margarine, or an amendment to the original standard. (21 U.S.C. § 371).

The motion of the claimant for summary judgment in its favor is granted and the libel is dismissed. The motion of the government for summary judgment is denied.

It is so ordered.